LUCY J. BABER *v.* JOHN C. KNIPP & SONS ET AL.
[No. 24, October Term, 1932.]

56

*Decided January 18th, 1933.*

The cause was argued before BOND, C. J., PATTISON, ADKINS, OFFUTT, DIGGES, PARKE, and SLOAN, JJ.

*Harry J. Green,* with whom were *David Friedman* and *Weinberg & Sweeten* on the brief, for the appellant.

*Rignal W. Baldwin, Jr.,* with whom were *Harold Tschudi* and *Semmes, Bowen & Semmes* on the brief, for the appellees.

DIGGES, J., delivered the opinion of the Court.

This appeal presents for decision one of the border line cases growing out of the administration of the Workmen's

Compensation Law (Code, art. 101, as amended). The claimant before the commission, and the appellant here, is the widow of Emmitt A. Baber, who was injured January 3rd, 1928, while in the employ of John C. Knipp & Sons, the insurer being the American Mutual Liability Insurance Company, who together are the appellees. Baber died September 6th, 1929. The record, while not at all full, indicates, and it is conceded, that the deceased, while working for Knipp & Sons, sustained an accidental injury on January 3rd, 1928, which produced a hernia; that under the direction and supervision of the appellees he was twice operated upon for that injury; that Baber made application to the Industrial Accident Commission and was awarded compensation, which was paid in full, and a final settlement receipt filed with the commission; that, subsequent to the death of Baber, claim for compensation was filed with the commission by the appellant in her own behalf, as wife, and on behalf of three minor children. A hearing was had before the commission, wherein the issue was whether the death of Baber was the result of an accidental injury arising out of and in the course of his employment. The finding of the commission, as evidenced by its order of December 8th, 1930, was adverse to the appellant, and the claim was disallowed. Appeal was prosecuted from that finding and order to the Baltimore City Court on December 17th, 1930, which appeal came on for trial in that court before a jury, upon the following single issue: "Was the death of Emmitt A. Baber the result of an accidental injury arising out of and in the course of his employment?" The jury, under instructions granted by the court, answered the issue, "No," and the court affirmed the decision of the commission. From that judgment the appeal here was prosecuted.

The case was tried in the lower court on the record made before the commission. The record in this court is a condensation in narrative form of the record made before the commission, which is somewhat confusing, and causes difficulty in determining whether certain objections to testimony ap-

pearing in the record were made before the commission or before the trial court. There, however, appear to be four exceptions contained in the record to rulings made by the trial court; three to rulings on questions of evidence, and the fourth to the granting of the appellees' "A" prayer, at the close of the whole case, requiring the jury to find for the defendants upon the issue in this case.

From the evidence submitted on behalf of the appellant, it appears that the deceased, after the injury producing the hernia, and being twice operated upon, never returned to work; and death ensued from a self-inflicted pistol shot a year and eight months after the accident. Further evidence on behalf of the appellant is to the effect that the deceased, before the accident, was a normal individual both physically and mentally; that he had been married twice; that he was divorced from his first wife, and had been married to the appellant ten years, of which latter marriage there were three children; that the second wife had also been married previously, and a daughter of hers was also a member of the Baber household; that before the accident the deceased was an easy-going and pleasant man in his family, always concerned with their happiness and welfare; that after the accident and two operations for hernia, he became cross, irritable, and disagreeable in his family and toward the neighbors; that from that time he had the unfounded idea that people were after his money; that he made statements that he would never get well, that he would never live to see his children grown, that he was going to commit suicide; that his talk at times was incoherent; that he would be at times conversing rationally, and suddenly would begin to talk about things of which his listeners had no idea; that he visited the insurance company's Baltimore office frequently, and insisted upon receiving checks for compensation at times when none was due; that after an agreement of lump settlement for his compensation had been made, he went to the office and demanded his check, and, upon being told that it had to be signed at the home office in Boston, he became enraged, and

his actions were such as to so frighten the employees in the office that they called in the police; that about two weeks before his death he had an altercation with a neighbor growing out of a dispute between their children; that the neighbor went into his own home, and, upon return to the yard, was stabbed by the deceased, which resulted in the neighbor being confined to bed; that on the day before his death the deceased went again to that neighbor's home, and, when the door was opened by the wife, without any provocation, he shot and wounded her; that on the day of his death he was found in the house of Mrs. Thompson, another neighbor, with whom he had never had any trouble, running through the house, upsetting the dining table, breaking the dishes and furniture, wringing the neck of a canary bird, and doing general damage to the room and furniture, to an extent estimated at $300; that Mrs. Thompson, upon seeing his condition, immediately left to call the police; and later, on that day, the deceased shot and killed himself. The record does not disclose at precisely what time or where the deceased killed himself. The testimony of Mrs. Baber also shows that about six years before his death, and therefore before the accident, the deceased got into an altercation with a drunken man who had chased two young girls into the deceased's yard, in an effort to protect the girls; that this altercation resulted in a civil suit for damages being brought against the deceased, and a verdict against him for $500.

The defendants offered the testimony of the first wife of the deceased, and his son by that marriage. The son's testimony was to the effect that they at one time lived in Richmond, Va., and while there a negro attacked the son, whereupon the deceased rushed out of a barber shop and killed the negro with a razor; that this was in 1905; that his father was a drinking man, but not drinking at the time of that occurrence; that his mother and father separated on account of his father drinking, and his mother went to Washington to live; that while she was living in Washington, his father came there, caught his mother in the house and "tried to

60

cut her throat with a knife"; he did cut her across the shoulder and there were a few stitches taken across her shoulder; he supposes his father was drinking; he did not see him before or after it happened.

As stated, there are three exceptions to the rulings of the court on the testimony, all growing out of the testimony of Dr. Hodes, an expert witness for the appellant. These will be first considered. Dr. Hodes was the last witness for the appellant before the commission. He had been present during the entire progress of the hearing, and had heard all of the testimony up to the time he was called. He was then asked: "Q. From the evidence you heard, doctor, could you state the mental condition of Mr. Baber at the time of his death? (Opposing Counsel): Can you state it yes or no? (Witness): If you allow me I can answer yes, but I will have to qualify it. (Commissioner Crothers): This is all right, doctor. (Witness): It is a known fact that in some individuals undergoing operations that the fear of the results is so great that it really becomes an obsession. Now this man from the evidence shows that he was normal mentally. Following this injury he showed mental changes, which was brought out in the testimony, such reaction as breaking up a woman's house, killing a canary bird and having the obsession that everybody was taking his money and everybody was against him, which all goes to show that the man was mentally unbalanced, and he consummated the whole thing by shooting an innocent woman, which in itself is an abnormal state the man was in. Now we go further—we can realize partly the reason, for this man was a high character man—took well care of his family, and that incident where he protected those two girls showed the moral character of this man. The accident happens and he is unable to make a living for his family and he becomes obsessed with that idea to the point where he became insane and committed suicide. I have seen dozen such cases in hospitals where such things have happened—no fault of the surgeon—it is just the individual.

(The Court) : Answer to stay in, eliminating 'after the accident' as misleading as to time. (Exception noted.)"

This constitutes the first exception. The testimony of the doctor was being read in court as given before the commission, and the court's ruling was to strike out from the doctor's answer what the court designated "after the accident," but its effect was to eliminate from the doctor's answer the analogous expression "following this injury." It is not clear as to what the ground of objection to the particular expression was, or that the reason stated by the court for its elimination would be sufficient ground; but if there be any error in this ruling, it is certainly not prejudicial, and therefore not reversible.

Taking up again the testimony of the doctor as given before the commission: "(Witness) : Can I explain that? (Appellees' Counsel) : I object to the explanation. (Witness) : I have only given half the answer. (Chairman Carr) : How did he kill himself? (Witness) : Shot himself. (Appellant's Counsel) : Doctor, what if anything induced the man to commit suicide? (Objection) In your opinion? (Objection). (The Court) : Objection sustained because further evidence has been taken in the case and question does not take into consideration all the facts."

This is the subject of the second exception. While this question may not be technically correct in form, yet the information which it sought to elicit was: "Assuming the suicide, what in his opinion was the cause?" It is clear from the court's statement that the objection was sustained because, after the doctor had concluded his testimony, there was other evidence adduced on behalf of the defendants, which was not and could not have been taken into consideration by the doctor, and therefore his opinion was expressed without taking into consideration all of the facts testified to. It seems clear that this reasoning was erroneous. It is unnecessary to cite numerous decisions of this court holding that a qualified expert, being present during the whole progress of the trial and hearing all of the testimony, can be asked for an opinion

based upon the evidence. But it is argued here, and the trial court so ruled, that it is essential that the expert witness hear all of the testimony in the case, both the plaintiff's and defendant's, before he is competent to give an opinion. The effect of such a rule would necessarily be that a plaintiff could not offer expert testimony based upon evidence taken during the trial except at the close of the whole case, which would mean a denial of this class of testimony in all cases where the defendant is granted a prayer for a directed verdict at the close of the plaintiff's case. If, on the other hand, the plaintiff would have the right to close his case with the exception of expert testimony, and reserve the right to produce this testimony at the close of the whole case, it would effectually prevent the defendant from ever being granted a directed verdict prayer before presenting his case.

While the ground stated by the court is not a proper basis for the ruling made, objection to the question was properly sustained, because the doctor as an expert witness was asked the broad question which the jury and it alone was called upon and entitled to decide. The jury heard the evidence, and from it was as competent to determine the question as the witness. Again the question does not limit the answer to the evidence adduced, but permits the witness to base his answer upon any theory or speculation in which he might be inclined to indulge, no matter how fanciful.

The third exception grows out of the following question: "Appellant's Counsel: Doctor, from the evidence you have heard in this case, leaving out the opinion, will you state whether or not, in your opinion, there was any connection between the operation and the subsequent insanity of this man?" Objection to this question was sustained and exception noted. We are unable to see any objection to this question, other than suggested by the reason stated by the court in respect to the preceding exception. What we said in regard to that exception applies in this instance, if the lower court's ruling was induced by the same reasoning. In our opinion, it seems clear that in order to rule consistently, the trial court would have been compelled to rule as it did in the

third exception for the reasons stated by it in the second exception.

The fourth and final exception is to the action of the trial court in granting the following prayer: "The employer-insurer prays the court to instruct the jury that there is no evidence in this case legally sufficient to show that the death of Emmitt A. Baber was the result of an accidental personal injury arising out of and in the course of his employment and the answer of the jury to the claimant's issue filed in this case must be 'no,' thereby affirming the decision of the State Industrial Accident Commission."

In passing upon this prayer, it being a demurrer to the evidence, the claimant is entitled to have that evidence regarded as true, together with all favorable inferences rationally deducible therefrom. The claimant was seeking to obtain compensation for the death of her husband from his employer and insurer. In order to do this, it was incumbent upon her to present competent evidence tending to prove that her husband's death was the result of an accidental injury arising out of and in the course of his employment. The finding of the commission was adverse to the claimant, and under the provisions of the statute the commission's findings are presumptively correct. Therefore the presumption is against the claimant, and whatever effect it has is to increase the burden which a plaintiff at all times carries. In this case she must therefore prove, first, an accidental personal injury to her husband; and, second, that such injury was the proximate cause of his death. The first she has fully proved, and is a *concessum* in the case, namely, that the deceased was injured while in the employ of the employer Knipp & Sons and engaged at that time in his employer's business; that the accident caused a hernia, for which the deceased was twice operated upon, and for which he had been awarded some compensation. The question, therefore, is whether or not the claimant has adduced competent evidence from which the jury might find that the deceased met his death as a proximate result of that accident; that is to say, competent evidence tending to prove such result. The fact that the

death occurred after the accident, standing alone, is no evidence of the accident being the efficient cause of death.

"Proximate cause" in this class of cases does not mean that the result must be the natural, usual, or expected one. While the statute (article 101, sec. 65, subsec. 6) provides, " 'Injury' and 'Personal Injury' means only accidental injuries arising out of and in the course of employment and such disease or infection as may naturally result therefrom," it has been determined by this court, in the case of *Bramble v. Shields,* 146 Md. 494, 495, 127 A. 44, 47, where the contention was made that the word "naturally," as used in the statute, must be held to mean "according to the usual course of things," in the sense of something to be contemplated or expected, that such was not the proper construction of the word "naturally"; it being there stated that all the cases relied upon for the construction contended for were contract cases, and cited former decisions of this court in tort cases where it was held that, although damages recoverable must be the natural and proximate consequence of the act complained of, such consequences include all damages of which the act was the efficient cause, even though the damages did not occur until some time after the act done, and were not contemplated or forseen by the wrongdoer. See *Sloan v. Edwards,* 61 Md. 89, 99.

In the case of *Baltimore City Passenger Ry. Co. v. Kemp,* 61 Md. 74, a tort case, wherein Mrs. Kemp had a cancer develop in her breast at a spot that had been bruised by the sudden starting of a street car from which she was about to alight, Chief Judge Alvey said: "It is not simply because the relation of cause and effect may be somewhat involved in obscurity, and therefore difficult to trace, that the principle obtains, that only the natural and proximate results of a wrongful act are to be regarded. It is only where there may be a more direct and immediate sufficient cause of the effect complained of, that the more remote cause will not be charged with the effect. If a given result can be directly traced to a particular cause, as the natural and proximate effect, why should not such effect be regarded by the law,

even though such cause may not always, and under all conditions of things, produce like results? It is the common observation of all, that the effects of personal physical injuries depend much upon the peculiar conditions and tendencies of the persons injured. * * * Hence the general rule is, that, in actions of tort like the present, the wrongdoer is liable for all the direct injury resulting from his wrongful act, and that too although the extent or special nature of the resulting injury could not, with certainty, have been foreseen or contemplated as the probable result of the act done."

In *Bramble v. Shields, supra,* which was a workmen's compensation case, wherein permanent total disability was claimed because of insanity arising as a result of personal injury, this court said: "But in cases arising under the Workmen's Compensation Law the question of negligence is excluded, and with it the rule as to reasonable and probable consequence would also be excluded, if such rule were applicable here. The only test is: Did the accidental injury arise out of and in the course of employment? If it did, it makes no difference whether it was a normal or abnormal occurrence, and so with 'any such disease or infection as may naturally result therefrom.' It can make no difference whether the results are usual or unusual, if there is a direct causal connection between the injury and the disease, so that the disease is directly attributable to the injury."

In the case of *Wilder v. Russell Library Co.,* 107 Conn. 56, 139 A. 644, 646, which was a case of a young woman who was librarian and became insane, the court, in passing upon her right to compensation, said: "'Cases where insanity can be said to arise out of the employment or the conditions under which it is required to be performed, particularly in the absence of traumatic injury, must be very rare. Where such a claim is made, a commissioner must give careful consideration to all the circumstances in evidence before him, not merely those surrounding the employment, but also those which have to do with any hereditary predisposition to mental disorder on the part of the employee, with his per-

sonal characteristics, and with his conditions of life outside the employment. Compensation is not to be awarded unless it is properly found that the insanity is traceable to the employment or its conditions as the direct causal agency which produced it, and that, had it not been for that employment or those conditions, it would not have occurred." The commissioner in that case found that the mental condition which caused the death arose out of and in the course of employment; and that finding was affirmed.

The evidence in the case of *Bramble v. Shields, supra,* was very similar to that in the case now under consideration, and showed that Shields was injured while working in a trench, which caved in, and he was covered by earth and rocks up to his neck. Upon his being extricated, it was found that both bones of his right leg were fractured, and there were lacerations upon the entire body, including laceration at the left groin about seven inches long, and fracture of the fifth lumbar vertebra. He was taken to the hospital and he worried about his condition, imagining his spine was decaying and that he would never get well. An X-ray failed to disclose any injury to his back or spine. The first finding of the commission was temporary total disability, and compensation was accordingly awarded on July 6th, 1922; and on January 3rd, 1923, a final settlement receipt was filed with the commission. On the following April 28th the wife of Shields filed a petition asking that the case be reopened, which was done, but the commission refused any further award. Shields was then insane; and the doctor in that case testified, as an expert, that in his opinion the disease resulted from the accident. An appeal was taken from the commission, which came finally to this court, which determined that there was evidence legally sufficient to support a finding in favor of the claimant, and stated that the testimony of Dr. Flannery, chief resident physician at Mt. Hope, who heard the evidence and testified as an expert as above indicated, was sufficient to take the case to the jury; there being nothing obviously improbable or fanciful in the conclusion reached by him.

In *Neeld Constr. Co. v. Mason,* 157 Md. 571, 146 A. 748,

749, a workmen's compensation case, where compensation was sought and the question was whether a diseased condition of the heart, which first made its appearance after the accident, was the result of the accident, and where the expert medical testimony was to the effect that it was not, it was said: "Apart from the opinions of the medical experts, the evidence was clearly sufficient to require the submission to the jury of the issue as to the injurious effect upon the claimant's heart of the blow inflicted upon his body in the region of that organ." It is apparent that medical testimony is not required in those cases where by other evidence facts are shown which fairly and logically tend to prove that the accident was the efficient cause of the condition complained of.

It would seem to be established in this state, in workmen's compensation cases, that "proximate cause" means that the result could have been caused by the accident, and that there has not intervened, between the accident and the result, any other efficient cause.

The appellees here rely largely upon the case of *Balto. & O. R. Co. v. Brooks,* 158 Md. 149, 148 A. 276. That case, like this, was one of suicide following in point of time an accidental injury. The deceased Brooks was injured in March, 1923, was taken home, then to a hospital, where he remained for several weeks, when he returned home, but visited the hospital at intervals until August, 1923, at which time he returned to work, and continued to work until April, 1924. It was testified by his physician that in May, 1924, he was suffering with tuberculosis of the lungs, and also had some mental derangement. Upon the advice of the physician he was sent to his father's home in the mountains of Pennsylvania; and in June, 1924, while at his father's home, he shot and killed himself. The only evidence in the case, outside of the medical testimony, in any way connecting the suicide as having been caused by the accident, was that while before the accident he had been pleasant and agreeable in his family, after the accident he was irritable and disagreeable. The expert medical testimony was that insanity was the

proximate result of the accident, because in the accident Brooks had been squeezed and crushed by a very heavy object on his chest, resulting in the pressing of the blood from his chest and body to the head, rupturing the blood vessels of the brain. These supposed facts were the entire basis of the doctor's testimony that the accident caused the insanity. From an examination of the testimony, it was shown that there was no evidence that Brooks' body was squeezed or crushed, and no injury of any kind which could have caused blood to rush to his brain and rupture blood vessels therein. There being no evidence to support the basis of fact upon which the doctor's testimony rested, it is apparent that it was properly excluded; and his being the only testimony in the case which could possibly show a causal connection between the accident and insanity, the case should have been withdrawn from the jury. It will be seen that the circumstances of the *Brooks* case are essentially different, and can form no basis for a similar ruling in the case now before us. While it is true that the effects of hernia do not naturally or usually produce mental derangement, the evidence offered by the appellant shows that the deceased never was able to work after the accident, and that he did many things that could more reasonably be classed as acts of a person of unbalanced or deranged mind than those of a mentally healthy person, culminating in seriously injuring two persons by stabbing and shooting, and the taking of his own life.

We are not deciding whether or not the proof of causal connection between the accident and the death is sufficient to carry the case to the jury without expert medical testimony to that effect, but we do determine that the two combined require a submission of the case to the jury, and that the doctor should have been permitted to answer the question which is the subject of the third exception. For the errors pointed out, the judgment must be reversed.

*Judgment reversed, and new trial awarded, with costs to the appellant.*

Bond, C. J., filed a dissenting opinion as follows:

Inasmuch as the physician, whose opinion as to the cause of the insanity was excluded, attributed that insanity to the injury, on the ground that there was no evidence that it had existed before, and inasmuch as the record before the court, and on which the appeal was being heard, did contain evidence of its previous existence, I consider that the exclusion was proper. The opinion was based upon an assumption as obviously mistaken in fact as if all the evidence of the other witnesses had been read before the physician testified. And if it should be necessary that the propriety of the exclusion be tested by only so much of the record as had been read to the jury up to that point, it seems to me improper to reverse the judgment now when we see that the excluded opinion was based on the mistaken assumption.